Good morning, Your Honors. May it please the Court, Daryl Martin appearing on behalf of Appellant Umpqua Bank. The key issues that I would like to have the Court at least consider and evaluate in this case is that there are no California decisions that are on all fours with the fact pattern of what occurred with Umpqua Bank's tender of its claim under its title insurance policy to First American. We have a very unique situation. We acknowledge the lateness of the tender. We acknowledge that things could have been done earlier, but it doesn't detract from the fact that when the tender was made and the claim was acknowledged insofar as we've received it, we've assigned it to somebody, we'll get back to you, that at that point in time, the ball is in First American's court. The ball is with them to do something with it. And what Well, it isn't exactly, because you sent it over there on January 30th of 2006. They confirmed it on January 31st, 2000. Excuse me, we're talking 2008. On February the 5th, you call and say we can settle it. And then on February the 13th, you call and say we've settled it. I mean, it isn't exactly that way. It isn't as if you were waiting for them to get back to you and you were waiting for what they were going to do. You went ahead with what you had to do and you call them and say, hey, we're now going even further. Now, on the 5th, we can settle this claim. Then you didn't get back to them again, didn't tell them, well, this is a settlement. You maybe got to give consideration to that. But on February 13th, you call and say it's settled. Well, we're saying it's in the process of it. And I think that we've given them the notice that there is something that's in front of them that's Did you ever send over the appropriate settlement or even what the discussions were? Your Honor, I will concede that, again, something more could have been done. But aren't we falling into this province of, well, if the insurer does it. My worry about your argument is this. Claim was filed in November 22nd of 2006. The first time you call First American is January the 23rd, 2008, or think about it and call. So there's all that time. Then you file the claim, finally, seven days later. Then, one day later, they confirm we got it. And from the 30th of January to February 13th, you settle your claim and never tell them anything about the fact that these are the terms of the settlement. And now you want me to suggest they are in trouble for not acting. What I'd like for what I would like to have seen First American do is what I'd like to have them at least respond and say, listen, I understand where you are. I understand this is a late tender. And, Your Honor, respectfully, going back, if we're going to talk about late tender, now we're delving into a prejudice standard. Now we're delving into a California court of assessment. I know what we're doing. I know what we're doing, because that's exactly where you've got to go. But I'm not pushing it to there. What I'm saying is First American had plenty of options. They could have said, we've received it. We're going to take the time we need to analyze this. We're going to reserve our rights, and we're going to let you do what you need to do. As to the ---- Kennedy, don't you have even a larger problem? You talked about the uncertainty of California law. Isn't California law absolutely clear on voluntary payment by an insurer? I don't think it's clear on voluntary payment when you have a tender, and then you have an advisement to the insurer that there is a settlement, a potential settlement. Even if we're looking at the newly filed case or newly cited case by First American, the Crowley decision, where you have the ---- just the suggestion of settlement that was triggering the nonvoluntary payment clause, here we have UMQA telling First American there is a settlement in the works, and First American has the opportunity, has the option to reserve its rights. It has a ---- But voluntary payment, you've got to look at whether there was consent by First American in here. There was no consent. And so what is your theory that this was not a voluntary payment, and what case supports that theory? The involuntariness of the payment, if you will, we've looked at that. We've briefed it before the district court, talked about exigent circumstances, talked about other situations where we are, in a sense, and much to our own doing, we've cornered ourselves with the exigency of a ---- I'm glad that you added that to our own doing, caused the exigent circumstances. Well, and I have to acknowledge it, Your Honor. I can't ignore the fact. I can't ignore the fact. And that's why I'm trying to drill down to what is the fact or facts that you're relying on to say, look, this should be counted as an involuntary settlement. We were motivated by economic necessity, or this was an extraordinary circumstance, or this was exigent circumstances. You're going with exigent circumstances. And so is there a case saying that where the conduct of the insured caused the exigent circumstances, that we should still construe it as involuntary? I don't think there is a case on point that talks about the insured creating the exigent circumstance, and that necessarily becoming a non-exigent circumstance where the insurer can say any payment you make after that is going to be voluntary. But the exigent circumstance certainly exists. And ---- But it's a little like a kid killing his parents and complaining about being an orphan, isn't it? I'm sorry? Isn't it a little like a kid killing his parents and complaining about being an orphan? Well, that might be a little extreme in that regard. But certainly I think that there is, with the nature of these, excuse me, with the nature of the real estate market that we were dealing with at that time frame in 2008, and we have projects that are falling off, this is an extraordinarily large development that was, you know, in a failing real estate market. And Umpqua Bank had gone through the process of determining that the mechanics liens were valid and that this was the best opportunity that it had to sell the property. How much time passed between your client's agreement to settle and the actual tender of settlement amounts? I want to say, without knowing the exact dates, I want to say it's less than 30 days. But it was not hours or it was some period of time. There was a settlement agreement that required the payment within a certain period of time. Okay. Let's just assume it's 30 days. Yes. During those 30 days, did you tell the title company, we've settled, we've settled for this amount, do you want to participate? On the 19th of February of 2008 ---- Start with a yes or no. I believe so. Okay. On the 19th of February, that is when Ms. Perrino, with First American, first returned an actual phone call to Mr. Isola, that was then counsel for Umpqua Bank, and said, what has happened? What is going on with this claim? Mr. Isola says, well, the settlement has been reached, and at that point in time, from Ms. Perrino's testimony, she says, well, then we consider the matter moot, because you have resolved the mechanics lien claims that were tendered on the 30th of January. And at that point in time, all communication stopped. And it's not until the second firm, my firm, got involved that we had forced the issue with them to say, we need a decision. We need a claims decision here, because you have ---- you need to pay on this claim. You haven't ---- you haven't denied it. You haven't accepted it. In fact, they didn't do that until 2009, when they finally wrote their coverage opinion and said, well, you don't have coverage because it was a created sufferer assumed loss. Sotomayor, I may have missed this, but during the 30-day period we were just talking about when you say First American was told of the fact of settlement, were they told of the amount? I believe they were, but I would have to look at the record, Your Honor, in that regard. There's nothing wrong with wanting to be careful. At any point during the 30 days period after First American was told of the fact of settlement and perhaps the amount, were they asked to participate? I don't believe within those 30 days they were asked to participate. I want to say sometime in around the April to May time frame. After payment had been made? After payment had been made, that we asked for a claims determination, because none had ever been issued. And, in fact, Ms. Perino had said we're stopping the process entirely, and we said you can't stop it. There is a claim. Do your duty. I think we understand your argument. Would you like to save some time for a rebuttal? I would, Your Honor. That would be great. Thank you. Okay. Thank you for coming in today. Thank you. Very interesting case. We'll hear from the title company at this time. Good morning, Your Honors, and may it please the Court. I'm Mike Kuzmich. I represent First American Title Insurance Company. I'm thrilled by the Court's questions, because we thoroughly addressed these issues. Well, don't be completely thrilled. You know, we give you an equal opportunity of users, as you're about to find out. Well, the reason I'm thrilled is that Umpqua Bank, in its briefs, has 75 percent of its issues that were not before the Court. Estoppel and Waiver were never raised to the district court. The third issue or the fourth issue, issue number 2 in their brief, is Exclusion 3A. We didn't move on that for complete summary judgment. The district court never reached it. In their briefs, they intertwine Estoppel and Waiver and bad-faith, bad-faith case law, duty to defend principles, and all of these things. And they throw it into a blender, hit the button, and then they say, look at it, and say, that's pretty nasty. There's got to be an issue with that. It is correct that at a point in time when a settlement had been reached on the mechanic lien, but before settlement monies were paid, that your client was told of the fact of settlement. Yes, Your Honor. They spoke on the 19th. Mr. Isola testified, and this is a supplemental excerpt of Record 208. Prior to June 2008, which is when the proof of claim came out, Mr. Isola never told First American he intended to pursue the claim. That was his testimony. But there at a point in time at which settlement had apparently been agreed upon and had specific terms, your client was informed of the fact of settlement. No, that's not correct, Your Honor. The settlement was signed on February 13th. The fax received the night before said that the settlement had been agreed upon. But your opponent is wrong when he says there was some time between notice to the title company of the fact of settlement and before funds were actually paid? I'd have to also consult the settlement agreement itself in terms of when payment was expected. But what Mr. Isola does not say in his testimony is, I called and said, I was waiting for you. I was waiting for you to consent. I was waiting for you to call me. What's your contribution? There's a letter in June. And now we're looking at events that occurred after the breach. That's the problem here. Well, let me take you then to February 19, which is where Judge Hawkins' questions took your opposing counsel. First American had contacted Mr. Isola. He told her, settlement's pending. He might have told her the amount. And according to counsel, she then said, well, then we considered the matter to be moot. But there was no formal claim determination made at that time. So First American never said, well, wait a minute. What's going on here? You're settling for one-plus-million dollars, and we never got a chance to participate any conversation along those lines, where First American then expressed a concern. You need to halt this process. You can't finalize a settlement agreement without our participation because that would be considered to be a voluntary settlement. Ms. Perreno's --- she interpreted the February 12th as no, isn't it? That's correct, Your Honor. Well, the thing that worries me, and I'm going to just focus on this just a little bit, February 19th, Ms. Perreno emailed Mr. Isola and asked him to contact her to discuss the claim. As I understand it, that discussion didn't happen until February 20th, when he returned her call, and at that point, he advised her the property had already been sold. It is also my understanding that he did not tell her there was some settlement, only that the property had been sold. That's my understanding. That's why I wanted you to see --- I wanted to see how you would answer my colleague's question, because once having been told the property had already been sold, then it was my understanding Ms. Perreno informed him that First American would halt its investigation. Her testimony was that she understood the claim to be resolved, the property had been sold, and that there was no more action requested on its part. The point is, I want to draw this back to the breach occurs before consent is received. The ask was never made. Mr. Isola never forwarded the settlement agreement. He never outlined the terms. The policy says written consent is required. It doesn't say notice of a potential sale of the property by the owner, which is not Umpqua Bank, it's the owner of the property, is going to resolve the lien. That's what his communication said. He had several opportunities to make the ask. He didn't get consent. And there may have been a 30-day payment period, but the ink dried on February 13th. The unauthorized settlement occurred on February 13th. The questions about what happened afterwards, what troubles me about them is they go to this waiver and estoppel arguments that are in the brief, where I told you again there's a blender of all kinds of different principles. There's plenty there's --- After agreement to settle and before payment was made, that perhaps your client had the opportunity to say, wait, time out, let us participate, let us resolve the claim, whatever. And you're saying that's not the case. They had a conversation, and her testimony is that she considered the matter closed. Because she had been told the property had been sold? That's correct, Your Honor. And as I started with, Mr. Isola's testimony was he didn't indicate that the claim was living on that point. That was his conclusion as well. The next record jumps to all the way to June, where there's a proof of loss. And so that was his conclusion as well. I'm sorry if I wasn't clear on that point earlier. That's fine. The national case, which is relied on by UMQA sites, some estoppel cases that I think are helpful because they show what UMQA didn't do. There's the State Farm case and the Boyle case. In those cases, they were auto cases, but the insureds tendered or, pardon me, presented a settlement agreement. This is the settlement agreement we intend to sign. Can we have your consent? And you know what they did next? They waited. When no consent was given, they waited. The courts ultimately found the insurers were estopped from relying on the MVP, but that was because four months had passed, ten months had passed. UMQA, as I pointed out, never made the ask. This is the agreement we need your consent to sign. It never made the ask, and it certainly didn't wait. And there's no case law in California that says MVP means you can give notice of a potential sale of the property. The cases are clear. MVP clauses are unambiguous. Consent means consent. You must have written consent. And you never made the ask. It's my understanding there were two policies here. Yes, Your Honor. Two loans and two policies. And they both had the same MVP clause? Yes, Your Honor. Okay. There's no requirement that you use all your time. Well, Your Honor, you know, we — I appreciated your questions to me, but our point — and I think the district court followed, and I think this Court — is a two-step analysis. Was there a breach? If the insured breaches the policy, the insurer doesn't have to do more. And the only exceptions are, did the insurer breach first? And here, there can't be an abandonment. There was never a formal denial of the claim. California law gives an insurer 40 days to adjust a claim or to request more time. And First American did not breach first. And there can't be a breach of the policy, an antecedent breach, by not returning a phone call or not responding to these communications about a potential sale of the property. UMQA breached. None of the exceptions apply. This was not an involuntary settlement. UMQA knew exactly what it was doing. It was a comprehensive settlement agreement. It — by its own admission, it was made out of financial necessity. They were mitigating a loss. They were mitigating a business decision. That's what banks do. That doesn't fall under any of the existing involuntary cases. So breach, no abandonment, no involuntary settlement. California clearly doesn't require prejudice. This Court has seen this case before in Faust. It's seen it before in Crowley. And summary judgment was affirmed in those cases. We'd ask that you do that here. Roberts. Thank you very much, counsel. Rebuttal? Thank you. Let's get your time on the clock. Is that right? That looks about right. Okay. Go. I'm glad my opposing counsel brought up the 40-day rule, because it's an interesting aspect to this case. Because what he's suggesting is that under the fair settlement practices of California law, an insurer can receive a claim that has 40 days in which it can do nothing. It has to deny — it has to make a decision, accept the tender, render a decision, render a claim analysis. Whatever it's going to do, it can ask for more time. But it doesn't — he's suggesting they don't have to even speak to the insured, other than to say, we've got your claim, we'll get back to you. When an insured is telling them during the pendency of this 40 days that there is a settlement in the works, and that is — this is a covered claim, this affects us financially because we are trying to sell real estate in a dropping market. We are doing all of these things to — to further this for your benefit, First American, because this impacts you as well. We are settling something that is covered, we believe, under the policy. That he's suggesting that, First American, they do nothing. And if the insured slips up, if the insured says, I can't wait for a response any longer, I have not received a response, Ms. Perino confirmed, there was no analysis undertaken, there was no investigation undertaken, there was nothing done, that if the insured slips up, well, then it is a windfall for the insurer. Judge Shub, although he did rule against us on the summary judgment motion, noted in his comments on the record the troublesome aspect of that, which is, where does an insured — what does an insured have to do? What magic words do they have to use? Because that's what they're asking us to do, is to use magic words. You need to say settlement. You need to say amount. You need to say terms. And we don't have to say anything. We don't even have to tell you on February 19th, when it's confirmed that they've done nothing with regard to this claim, that, whoa, you realize 7A of the policy. If you pay on that, if you've settled this, your claim is over. That isn't the response from Ms. Perino. Ms. Perino is, we consider this moot. I'm done. Closing the file and moving on. Good to speak to you, Mr. Isola. And that's not what — what Umpqua Bank bargained for when it purchased its policy of title insurance. I do want to push into the second half of our argument, which talked about the — the ultimate decision that First American rendered in this case in June of — or May of 2009, which was the ultimate decision to deny the claim based upon the — created, suffered, or assumed 3A exclusion. And they dovetailed that into this juxtaposition of stock notice versus mechanics lien. I've litigated this at the trial court level. I've — I've looked at this issue a lot, and I've fought with First American on other cases about this issue. It's a fascinating argument, because you have two concurrent remedies for materialmen on projects that they can pursue independently, concurrently, collectively, however they want to do it. First American's position is that if a lender — excuse me, if a materialman has made a valid stop-notice claim, which has only to do with whether or not they have provided a work of improvement affecting the property, that the existence and nonpayment on that stop-notice claim abrogates — doesn't even trigger coverage under mechanics liens. Now, the policy speaks for itself. I don't want to delve into that too much, but I think what's important to note about that is the fact that First American made a decision to say, you don't have coverage at all because of the existence of the stop-notice claim. The stop-notice claim doesn't require a detailed analysis. Under the familian decision in California, stop-notice claims are valid, and they can reach to a lender's interest reserves that they've already paid themselves. It can reach to loan fees that the lender has paid themselves, and it can reach to undisbursed loan funds. If the project is big enough, as these large residential subdivisions were, then First American knows full well, the moment it writes this policy, whether it has — is going to be in a situation where it's going to be actually facing mechanics lien coverage, because the bigger the loan, the bigger the interest reserve, the bigger the loan fees. And in this case, we're talking about hundreds of thousands of dollars that Umpqua Bank could potentially be responsible for pulling out of its coffers to pay to a material man if a stop-notice claim comes — comes — excuse me, is made. And that's why First American, when it — when it underwrote this policy, and they made it — they made it clear in their brief, they said, we underwrite these — these policies for our benefit. We do — we do the risk analysis for our benefit. And that was the whole point of this, which is, it's an illusory coverage to begin with. They know full well they're never going to suffer mechanics lien losses, and they could have made that decision and advised Umpqua Bank at the outset, I don't care if you — if you enter into a settlement agreement, you don't have coverage. And they didn't do that here. I see my time is out. I thank Your Honors for the time. Roberts. Good timing. Thank you for your argument. Thank you both, counsel, for your argument. This is a very interesting case, which is now submitted for decision.
judges: Hawkins, Smith, Nguyen